All right. Good morning, Your Honor. May it please the court, I'm Chad Hatfield, attorney for Mr. Pumroy and his appeal to Social Security Disability claim. This is a de novo review of the Administrative Law Judge ALJ's decision. Mr. Pumroy, and I would do wish to reserve two minutes for rebuttal. Very well. Mr. Pumroy is a Marine combat veteran with severe PTSD and while he had anxiety, depression, and mild to moderate neurocognitive compromise for repeated traumatic brain injuries, his primary basis for alleging disability is the inability to leave his house following nightmares, resulting in rescheduling appointments, changing plans, unable to go to class, inability to complete schoolwork even in his own home. ALJ briefly noted that, you know, there was improvements in medication and record noted he'd go five days without a nightmare at times. However, this is not inconsistent with Mr. Pumroy's contentions. His debilitating nightmares occurred between a couple per month to a couple per week. Let's consider the records. Example, a car 537. Veteran tells you he'll sleep well for six or seven nights and then have a nightmare and is able to get any sleep for two to three days after that. The importance of this is that the ALJ spent most of the decision and formally his entire RFC based on what he observed on the days when Mr. Pumroy could attend appointments. He's not following the nightmares. Noted there was tangential speech at times, depression, anxiety at times, but also noted that sometimes those moderate, you know, depression, anxiety was not as significant in those days. His RFC then therefore limits interaction with the public and co-workers to occasional and the complexity of the task. However, that doesn't even address the days after nightmares where he's not able to go even to his mental health appointments, which is a one-on-one interaction with someone he knows well, has for a long period of time is known, and who is trained to know how to do his homework, which is done within the confines of his own home. So a limitation to occasional public, co-workers, or complexity of tasks does not begin to address his primary symptom for which he alleges disability. For every notation the ALJ provides for improved medication, for example, CAR 800, patient's PTS nightmares were noted to be increasing in severity after initially improving on medication. It goes back, Mr. Pomeroy's briefing is noted in the times where increased nightmares. Most of the citations to that ALJ uses though are in regards to the depression, the anxiety, the more day-to-day interferences he has, and not his primary debilitating symptoms. The ALJ also... Excuse me, how do we deal with the activities he does engage in? That is to have been doing a fair number of things. Are you saying that his engaging in wrestling, his going to class, and so on, he can skip those things, and so that's consistent with his description of his periodic inability to leave the house? Correct. Like he stated in his testimony, he'll set his schoolwork aside, he will not go to classes that allow that kind of flexibility. Childcare, he has someone step in and help him, he's not able to do it. Was there a period during which he had the kids for like 14 days? How did that one work? Well, again, that was during a COVID exposure, two-week period. Again, not really inconsistent with having, you know, two bad nightmares per month, but he also said he has help for those days where he can't handle it. So, there's family support. It's very different than a workplace where there's a expectation to be there every day and a minimum level of performance that must be done each time. Right, yeah, no, I get that, yeah. So, counsel, I did have a question for you about some of the notes from Dr. Consato. It seems to me that there's, at least I'm confused, if there were two visits or one, I guess is what I'm saying. So, I'm going to direct you to page, I think it's 671 of the record, and then 681 of the record, and both of them are Dr. Consato's notes on your client. One is dated, I think, June 4th, 2021, and one is dated January 28th, 2022, and it seems to me that these are actually the same visit. They have the wrong date on the top. I'm guessing when it was generated off the system, just a date gets put on, almost like an auto date on the notes, and this could be important to our decision. Can you talk about whether or not you know if these two are actually referring to separate visits or it's the same visit? And I can give you some reasons why I think it's the same visit, but you may know the answer better. Well, I'll say for first, it's not to be generated because the data's appear on the left side above the patient's name. So, that would be the date of treatment. Well, the reason why I ask is because all of the data on the forms, other than the date, is identical. The BMI is identical, the temperature is identical, the age is identical, which can't be right because one's almost a year later. So, I have some suspicions that there may be some confusion in the record as to whether there really was a post-surgery visit or just one pre-surgery visit. I'll ask it this way, is there any other evidence other than this document dated January 28, 2022, that suggests there was a visit after the surgery? Yes, in March of 2022, CAR 38 and September of 21, CAR 684 to 687, on those ones, and there it was talking about following the surgery, they did have some improvement with pain, but not with the numbness. It came with activity. Yeah, but the question is really whether the January 28 is the June 4, and I'll just follow on with what Judge Owen said, it's verbatim the same. Every word, every comma, every capitalization is the same. Yeah, I mean, it's a specialist, I'd say a copy and paste. I mean, even the pulse is the same, and I mean, I give blood three times a year and my pulse is never identical every time, nor is my weight, unfortunately. Right, so yeah, it may be laziness by the provider. I mean, I can't say that that doesn't look like a cut and paste of the history of present illness on doing this. I would say, though, it does have the following surgery, September of 2001, did show that was having decreased motor strength, decreased pin brick sensation in both hands, and positive TINELs signed present at both wrists and ulnar grooves. So, Mr. Hatfield, may I interrupt you for a second and get to the question of the carpal tunnel syndrome situation? Do you have any criticism of the ALJ's finding that the active daily tasks were well-performed? Well, yes, because Mr. Pomeroy is not stating that he can't use his hands. His complaint said he said he would do his daughter's hair. He would do daily activities and then have to rest his hands for 15-30 minutes due to decreased sensation numbness, which is and fingering. So, it's not that he can't do some of these tasks, and he did say pain did improve after the surgery. It's just the numbness will keep it, restrict him for how long he can do it and the persistence he can do it. Do you have any claim that the ALJ did not consider the subjective symptoms stated by the applicant and did not rebut them, absent any malingering, by any objective evidence? Yes, that's correct, Your Honor, and also I'd argue with the date of onset. The ALJ used the date of the EMG to say the diagnosis of carpal tunnel syndrome, but we see in part of the reason he stopped work in the beginning was due to problems he couldn't handle his firearm, his difficult manipulation. December 2020 was noting CAR 569, numbness to his fingers. At that time, it was due to his elbows or due to carpal tunnel syndrome, and so the evaluation EMG was only to say, hey, this is carpal tunnel to identify it, but that should not have been the onset of symptoms or the start of the durational 12-month period. So, that was a clear error on behalf of the ALJ to try to set that time frame when these were complaints that were addressed long before. The ALJ really just didn't address that. The only thing the ALJ addressed was this time frame. Counselor, you're going into overtime. I'm going to ask you a I'm going to give you some time for rebuttal. I think one question I have, and I imagine my fellow panel members may as well, is any attempts to mediate this case or would you be interested in going into our court's mediation program, which has success in these types of cases? You don't need to give an answer now if you want to think about it and then get back to us during rebuttal. I'll give you two minutes for that. All right, thank you. All right, thank you, Counsel. Good morning, Your Honors. May it please the Court, my name is Michael Mullen and I represent the Commissioner of Social Security in this matter. Would you get closer to the microphone? Yes, Your Honor. Let me lift this. There you go. Okay, we'll try that again. May it please the Court, my name is Michael Mullen and I represent the Commissioner of Social Security in this matter. I'd like to clarify a couple points with respect to the ALJ's finding that Appellant's carpal tunnel syndrome was not a severe impairment. Not only did the ALJ's decision show that Appellant's carpal tunnel syndrome did not meet the durational requirement, but also that it improved with treatment. I'd like to return to your point. I have some questions about that, Mr. Mullen. Yes, Your Honor. The ALJ apparently found that he could do the daily tasks of, they were exceptionally demanding activities of daily living and he was doing fine taking care of his two young daughters, shopping for grocery, doing the laundry, etc. in 2020. But the testimony by Mr. Pumroy in March of 2022 was quite different from that. He said he couldn't even tie the ponytail on his daughter's hair. That's not really taking care of his two daughters. He could not carry grocery bags without looping them around his wrist. That's not really doing the laundry. He couldn't mow the yard, hadn't done it for a couple of years. It sounds to me like what the ALJ did was consider the daily tasks before he heard the subjective symptoms in 2022 and did not find anything indicating evidence in the medical records to rebut the subjective symptoms. And that's what I don't think he did. Can you help me out on that? Certainly, Your Honor. One is that the appellant's subjective complaints were inconsistent with not just the activities of daily living that you were just discussing, but also, for example, objective medical evidence. So I would point you to, for example, page 694, 691 to 694 of the record, where following the surgery, appellant had 5'5 strength in the upper extremities, have full range of motion in the elbows with minimal pain, was pleased with the results of his surgery. And again, that objective medical evidence is inconsistent with the inability to, for example... But he didn't cite those portions of the record, did he, in rejecting the subjective symptoms? Yes, Your Honor. So if you look at the decision as a whole... Yes or no? Yes, Your Honor. The ALJ did cite those activities. Where? For example, on page 21 of the record. And in the ALJ's decision, he talks extensively about the activities of daily living. And then he also goes on to talk about appellant's improvements through surgery. So to give a short timeline on those improvements through surgery, appellant was complaining of numbness in the hands as early as October 2020. And you see that in the record at page 569. And then he was diagnosed with carpal tunnel syndrome in when EMG confirmed that he had carpal tunnel syndrome. In September, he had surgery on the right upper extremity. And that was not just carpal tunnel surgery, it was also median nerve. I noticed on page 21 that you just cited me to, there were several mentions of 2019 and 2021. But there's no mention of anything after his testimony of March 22. Your Honor, the date last insured in this case was January 31st, 2021. And so worsenings of symptoms past, you know, in 2022 and beyond are really irrelevant to this case. Say that again, Cart. The date last insured in this case was January 31st, 2021. And so evidence of any worsening of symptoms following, you know, into 2022 is really irrelevant in this case. But again, looking at the evidence in 2021, for example, there is good evidence of him continuing to engage in robust activities of daily living during the relevant period. For example, page 663 of the record, dated in July 2021, where he's endorsing that he enjoys activities and hobbies such as wrestling, fishing, caring for his two acres of lifting weights. Other tests are other medical evidence from, for example, August 21. August of 2021 shows that he was gutting and cleaning fishes with his kids. That's page 815 to 817 of the record. So he was engaging in activities of daily living during the relevant period that were inconsistent with the alleged severity of symptoms. And again, there might be different readings of that. But deference is owed to the ALJ's findings of the highly deferential standard of review. What do we do with the complaints of PTSD and the disabilities that flow there from? Thank you, Your Honor. That's a good question. This was something that opposing counsel was touching on during his presentation. And I took note that really what he was saying was inconsistent with this court's guidance in, for example, Molina, where it explains that, you know, the ability to perform an activity may suggest some difficulty, but doing the activity itself suggests greater ability than actual disability. No, no. Let me make the question more pointed. It is that on some days, and in his view, too many days, he's going to be disabled. When he's good, he can do it. But there are going to be too many days in which he just can't do it because of the PTSD, the nightmares and so on. Thank you, Your Honor. How do you respond to that? And that's where I was going with that was that, for example, he alleges that he had nightmares at a frequency that made it difficult for him to attend college classes. But he was enrolled in college for 18 months as a full time student. And in his own word... Wait, wait, wait. You can be enrolled and you can be a full time student in the sense that you're required to pay full time tuition. That doesn't mean you're going to class every day. That's true, Your Honor. But in Appellant's own words, he did testify that he performed decently in his college courses. I mean, he may have had some difficulty. And that's why I'm drawing the allusion to Molina here, because, yes, he may have struggled with math and science classes while taking classes to become a nurse. But nevertheless, he performed decently in school. And the ALJ was entitled to consider his performance in college, particularly when you consider it with all the other activities of daily living that he was involved in. You know, again, if he was struggling to leave his house, he was still actively involved in a wrestling league. He testified that he was still caring for his daughters and taking them to appointments, thus leaving the house. And that's the level of function that the ALJ considered, and that's the  his symptoms. And again, to your point, Your Honor, I'd like to quickly get back  I think that the ALJ found that he was able to leave his house when necessary. And again, that's why I think that the comparison to Molina is so important here, because it may have... I don't doubt that it was difficult for him to leave his house, but he was able to do it when necessary. And that's the level of about the timing of those medical notes that he alleges show that he met the durational requirement. It is, in fact, based on a misreading of those medical notes. So I would look at page... You're now talking carpal tunnel syndrome. I am. Sorry, I wanted to cover that, Your Honor, while I still have time. Appellant argues that page 682 shows a medical record from January 2022, thus somehow satisfying the durational requirement. But again, that medical note was June 4th, 2021 at 1.48 PM. You can compare that to other medical records, for example, at page 670 of the record. And you can see that those e-signatures just don't line up with appellant's timeline of the case. But again, even if appellant somehow satisfied the durational requirement, the ALJ still reasonably found that he improved through surgical treatment. That surgical treatment was not just working on the actual ulnar nerve, which was responsible for the elbow impairment. And so appellant had an elbow ulnar nerve neuroplasty as part of that operation. You can see kind of a description of those surgical operations at pages 684 and 686 of the record, making that point really clear. And so even if he met the durational requirement somehow, his symptoms were still improved significantly with treatment. Following the treatment at pages, like I said, 691 to 694, you can see that he demonstrated in both arms full range of motion of the elbow with minimal pain, but he had five out of five strength, normal range of motion, that he was, in his own words, pleased with the reports. After the right arm, he was eager to continue and do his left arm. His pain was controlled, and he indicated that he had improvement and improved sensation. Can you speak to the idea of mediation in this case and whether the government would be open to it? Well, we'd be open to hearing points with respect to mediation, but I don't think that mediation is necessary in this case. Under the highly deferential standard of review, substantial evidence supported the ALJ's finding that appellant was not disabled, that his carpal tunnel syndrome was not a severe impairment, that it improved through treatment, and that his robust activities of daily living were really at odds with the alleged severity of his complaints. To say nothing of his non-compliance with treatment, using marijuana against his provider's recommendations, which was interfering with the efficacy of his medication and his ability to use medication. I am out of time. I'd be happy to answer any further questions that your honors have, but that ends my presentation. You said mediation is not necessary. Would the government be willing to engage in mediation? Yes, your honor, we're open to mediation. It's highly unusual in social security cases, but again, it is the commissioner's position that substantial evidence supports the ALJ's decision in this case and that this court should affirm. All right. Thank you, counsel. Thank you, your honors. Mr. Hatfield, give us a second so you can rise from below. You're going to, you're going to pop, your screen's going to pop up here. Mr. Hatfield, I have a question to ask you based on a statement made by your friend that the worsening symptoms in 2022 are irrelevant in this case because the date of disability is January 21st, 2021. Is that, do you, do you share that view? No, your honor. I think, I think that the point Mayden was making was that they were new symptoms. It just started after the date last insured would be covered. But this is a condition that started prior to the date last insured. All it has to, it could be, it could have started on the day of the date last insured and they continued for years in the future and been relevant. The, the, the example here of a post-op visit of feeling well, being pleased. This is during a time of rest and recovery from post-operative. I mean, you're not using your hands or waiting to see how it goes and showing up and doing this. The, the testimony by the claimant, how he did afterwards, we started using his hands again. It's very relevant because the RFC is not supposed to be during a period of how he feels, but how he feels if he's doing work and using the hands. And that was the problem that the pain range of motion had improved. And that's what the record had stated, but the numbness and tingling caused the breaks. And that continued on. And so even if there's a brief period of rest and recovery from surgery, pleased with the result, that would not interfere with the 12 month durational element. No further questions. Unless you have something else, I think we're good here. Yeah. I mean, you're on, you're asking about mediation. I agree. It's very unusual social security cases here. I'm forced, never turned down the opportunity to discuss and resolve cases to help. I would say the difficulty would be, of course, if even in the lowest range, Mr. Pomeroy talked about two days per month only, as opposed to two times per week. Even if we mediate, say what percent of the time was it? The vocation experts said two days a month is work preclusive on its own. That's too often. So even at the very minimal bottom end of that range, it'd still be disabling. So I don't know that we necessarily have to kind of agree on like how often at what range it is, the entire range would be in an area of being preclusive of competitive employment. Thank you. All right. Thank you both for your briefing and argument in this matter. It's been submitted. We'll go ahead and it's almost like you're on a game show, Mr. Hatfield, like we'll see you later. And you've literally, you kind of just disappear from the screen.
judges: FLETCHER, BEA, OWENS